Deborah Ann JAHNKE,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 83–121.

Supreme Court of Wyoming.

Dec. 12, 1984.

Terry W. Mackey and Robert W. Tiedeken of Terry W. Mackey, P.C., and Jeff Brinkerhoff, Legal Intern for Terry W. Mackey, P.C., Cheyenne, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., Dennis C. Cook, Asst. Atty. Gen., Thomas J. Carroll, Dist. Atty., and Jon Forwood, Deputy Dist. Atty., Laramie County, for appellee.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

THOMAS, Justice.

The critical question to be resolved in this case is whether voluntary manslaughter is a lesser-included offense when the charged offense is murder in the first degree; more specifically, whether the offense of aiding and abetting voluntary manslaughter is a lesser-included offense of aiding and abetting first degree murder. Other issues presented relate to the denial of the suppression of the teenage defendant's statement to sheriff's officers; the constitutionality of vesting discretion in the prosecuting attorney to determine whether charges should be filed in juvenile court or in the district court where the defendant is treated as an adult; and the legality of the sentence imposed when appraised in the light of the state constitution.

Deborah Ann Jahnke was charged by Information with aiding and abetting her brother in the first degree murder of their father, and with conspiracy to commit first degree murder.[1] A motion to transfer the case from district court, where Deborah Jahnke was charged as an adult, to juvenile court was denied. At her trial the district

---

1. At the time of the commission of the homicide the respective statutes provided:

Section 6-4-101:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, sexual assault, arson, robbery or burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree.

"(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law."

Section 6-1-114, W.S.1977:

"Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed an accessory before the fact, and may be indicted, informed against, tried and con-victed in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or informed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

Section 6-1-203, W.S.1977:

"(a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons to commit a crime and he or another person does an overt act to effect the object of the agreement.

"(b) A person is not liable under this section if after conspiring he withdraws from the conspiracy under circumstances manifesting voluntary and complete renunciation of his criminal intention.

"(c) A conspiracy may be prosecuted in the county where the agreement was entered into, or in any county where any act evidencing the conspiracy or furthering the purpose took place."

court admitted her statement to the officers of the sheriff's department into evidence and instructed on the lesser-included offense of aiding and abetting voluntary manslaughter. After her conviction of aiding and abetting voluntary manslaughter and her acquittal of other charges the district court sentenced her to serve not less than three nor more than eight years in the Women's Correctional Center. We affirm the district court.

In her brief in this appeal Deborah Jahnke states the issues as follows:

"I.

"THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GIVING INSTRUCTIONS NUMBERED 13, 21, and 22, BY WHICH THE JURY WAS INSTRUCTED THAT THEY COULD FIND THE APPELLANT GUILTY OF THE LESSER INCLUDED OFFENSE OF AIDING AND ABETTING VOLUNTARY MANSLAUGHTER UPON A SUDDEN HEAT OF PASSION.

"II.

"THE TRIAL COURT COMMITTED ERROR IN DENYING APPELLANT'S MOTION TO SUPPRESS HER STATEMENT AND IN PERMITTING HER STATEMENT TO BE USED AGAINST HER AT TRIAL.

"III.

"THE DISCRETION VESTED IN THE DISTRICT ATTORNEY BY SECTION 14–6–203(c), W.S. (1977) (CUM.SUPP. 1983), WHICH PERMITTED THE APPELLANT, A JUVENILE, TO BE CHARGED AS AN ADULT IN THE DISTRICT COURT IS UNCONSTITUTIONAL ON ITS FACE.

"(a) Section 14–6–203(c) W.S. (1977) (Cum.Supp.1983) violates the constitutional doctrine of separation of powers by placing judicial power in the hands of an executive officer as proscribed by Art. 2 Section 1 of the Wyoming Constitution.

"(b) Section 14–6–203(c) W.S. (1977) (Cum.Supp.1983) violates Appellant's right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution and Art. 1 Section 6 of the Wyoming Constitution.

"(c) The discretion vested in the District Attorney by Section 14–6–203(c) W.S. (1977) (Cum.Supp.1983) deprived Appellant of equal protection of the law as guaranteed by the 14th Amendment to the U.S. Constitution and by Art. 1 Section 2 of the Wyoming Constitution.

"IV.

"THE SENTENCE IMPOSED UPON APPELLANT VIOLATED ART. I SECTION 15 OF THE WYOMING CONSTITUTION."

The brief of the State of Wyoming rephrases the same issues in this manner:

"I. WAS IT ERROR FOR THE TRIAL COURT TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER?

"II. WAS IT ERROR FOR THE TRIAL COURT TO DENY APPELLANT'S MOTION TO SUPPRESS HER STATEMENTS OR CONFESSIONS?

"III. DOES SECTION 14–6–203(c) PASS MUSTER UNDER BOTH STATE AND FEDERAL CONSTITUTIONAL PROVISIONS HAVING TO DO WITH THE SEPARATION OF POWERS, EQUAL PROTECTION OF THE LAW AND DUE PROCESS OF LAW?

"IV. DOES APPELLANT'S SENTENCE VIOLATE ARTICLE 1, SECTION 15 OF THE WYOMING CONSTITUTION?"

The facts surrounding the killing of the Jahnke children's father have been reviewed in the case of *Jahnke v. State*, Wyo., 682 P.2d 991 (1984). They can be reiterated briefly. Following years of both physical and psychological abuse of the children by the father, matters came to a head on the evening of November 16, 1982. After an altercation between the deceased father, Richard Chester Jahnke, and Deborah Jahnke's brother, Richard John Jahnke,

which included the father's striking the brother with his fists, the Jahnke children's parents went out to dinner. While they were gone Richard made elaborate preparations for confronting his father. These preparations included loading firearms and placing them at several "back-up" locations throughout the house; putting the family pets in the basement for their safety; and waiting in a darkened garage with a shotgun loaded with slugs for the parents to return. When the parents did return Richard Jahnke shot six times through the garage door, with four of the slugs striking the father and killing him almost instantly.

Deborah Ann Jahnke's role in these events began on that evening when she observed the assault upon her brother, Richard, and heard her father tell her brother, "We're going to get rid of you, we don't know how we're going to, but we're going to get rid of you." Deborah Jahnke stated that where her brother went she also went, but she was rebuffed by the father, who told her, "Shut up, you slut" and sent her back into her own room. From her bedroom Deborah Jahnke heard the events of still another verbal and physical assault upon the brother. Just before the parents left, the father returned to the house and shoved the brother, Richard, against the wall, stating "I'm really disgusted with the shit you turned out to be. I don't want you to be here when I get back."

Deborah Jahnke watched as her brother changed the ammunition in a modified .12 gauge shotgun, the death weapon, from what their father referred to as "candy-cane mix" to the fatal slugs. While the brother, Richard, was placing loaded weapons in "back-up" positions in the family room and the basement, he told Deborah to get her shoes on because he wanted to get her out of the house before the parents returned. Deborah put her shoes on, but she made no further preparations to leave because she began experiencing feelings of guilt about leaving her brother there alone. She decided not to leave but that instead she would stay to help her brother.

After this decision Richard demonstrated the use of two of the weapons, a 30.06 rifle in the basement and an M–1 carbine, to Deborah. Deborah explained that the M–1 carbine was selected for her to use because it kicked less than the other weapons. Other preparations made by the Jahnke children included turning on a number of lights in the house for the purpose of creating temporary night blindness for the father if he was able to enter the house; shutting off most of the exterior lights with the exception of those which illuminated the driveway outside of the garage; and placing the family pets in the basement to prevent them from being harmed or getting in the way. These latter two steps were accomplished at Deborah's suggestion. Deborah stated that she perceived her role as a type of backup in the event something went wrong.

After Richard had stationed himself at his place of waiting in the garage, appellant on one occasion went into the garage and was escorted back into the family room by her brother, who told her to stay away. As he was returning to the garage Deborah asked Richard whether he intended to kill their mother also. Richard testified that Deborah was upset when he told her, "no," and she asked him to kill "Mom."

The parents returned at approximately 6:15 p.m., and as the father approached the garage from his parked vehicle Richard fired the fatal shots. In the statement that she furnished, Deborah said that she knew Richard was angry and would do something. She thought he would be active, but she did not expect "that he would just, you know, blow my father away." She heard the shots from the garage and wondered whether she should pick up the M–1 carbine. While trying to decide whether to grab the weapon, Deborah heard footsteps and her brother came down the hall from the garage area. Deborah ascertained that her mother was not shot, and went into her room, shut off her stereo, obtained a coat and book, and then fled with Richard through an open window from the master bedroom. They separated soon after they

left the house, and she went out into the hills and plains adjacent to their home.

After fleeing the house, Deborah proceeded toward a shopping mall, and from there to the area of a roller rink, where she spoke with two of her friends. She then went to the clubhouse of a large apartment complex, where she spent the night. When she awoke the next morning she borrowed a newspaper from the doorway of one of the apartments. She read the article about the events of the prior evening, replaced the newspaper, and went from the apartment complex to a nearby park which she was seen entering at about 6:30 a.m. Then Deborah was picked up by a deputy sheriff, and she agreed to accompany the sheriff's officers to their office to talk.

Two days after the father's death, on November 18, 1982, a formal complaint was filed charging Deborah Jahnke with aiding and abetting her brother, Richard, in the commission of first degree murder and with conspiracy to commit first degree murder. She appeared before a county court judge and waived her right to a preliminary hearing, and she was bound over to the district court. On December 1, 1982, the Information, charging the same offenses as those included in the complaint, was filed in the district court. Deborah Jahnke was arraigned on December 3, 1982, at which time she entered pleas of not guilty to both counts of the Information. A Motion to Transfer to Juvenile Court System was filed on her behalf, and following a hearing this motion was denied on February 23, 1983. Deborah Jahnke also presented a motion to suppress her statements, which was denied after the court found those statements to have been obtained after a knowing, intelligent and voluntary waiver of her right to remain silent.

The trial in this case began on March 7, 1983, three weeks after the trial in the case of the brother, Richard. Following the close of the evidence the district court did instruct the jury on the lesser-included offense of aiding and abetting voluntary manslaughter. On March 10, 1983, the jury returned its verdict, finding the appellant guilty of the offense of aiding and abetting voluntary manslaughter and acquitting her of the other charges. The Judgment and Sentence on that verdict was entered on May 23, 1983. Deborah Jahnke was sentenced to serve not less than three nor more than eight years in the Women's Correctional Center for her participation in the patricide. Additional facts essential to the justification of our disposition of the appeal will be presented in connection with the discussion of the several issues.

The first issue to be addressed is the propriety of the trial court's instructions to the jury with respect to the lesser-included offense of aiding and abetting voluntary manslaughter. Those instructions were:

### "INSTRUCTION NO. 13

"If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged, she may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged, if the evidence is sufficient to establish her guilt of such lesser offense beyond a reasonable doubt."

"The offense of aiding and abetting first degree murder with which the defendant is charged, includes the lesser offense of aiding and abetting second degree murder and also includes the lesser offense of aiding and abetting voluntary manslaughter."

### "INSTRUCTION NO. 21

"Pertinent portions of the Wyoming statutes provide as follows:

" 'Whoever unlawfully kills any human being without malice, expressed or implied, ... voluntarily, upon a sudden heat of passion ... is guilty of manslaughter'."

### "INSTRUCTION NO. 22

"The necessary elements of voluntary manslaughter are:

"1. The crime occurred within the county of Laramie on or about the date of November 16, 1983; and

"2. The principal killed a human being; and

"3. The principal acted voluntarily

"4. Upon a sudden heat of passion."

 The first aspect of Deborah Jahnke's argument is that voluntary manslaughter is not a lesser-included offense with respect to the charge of murder in the first degree. Traditionally, with the exception of a charge of felony murder,[2] voluntary manslaughter has been considered a lesser-included offense to the charge of murder. *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); *State v. Selig*, Wyo., 635 P.2d 786; *Searles v. State*, Wyo., 589 P.2d 386 (1979); *State v. Helton*, 73 Wyo. 92, 276 P.2d 434 (1954); *Eagan v. State*, 58 Wyo. 167, 128 P.2d 215 (1942); *Espy v. State*, 54 Wyo. 291, 92 P.2d 549 (1939); *State v. Lantzer*, 55 Wyo. 230, 99 P.2d 73 (1940); *Flory v. State*, 40 Wyo. 184, 276 P. 458 (1929); *State v. Sorrentino*, 31 Wyo. 129, 224 P. 420, 34 A.L.R. 1477 (1924), reh. denied 31 Wyo. 499, 228 P. 283, 34 A.L.R. 1487 (1924); *Meldrum v. State*, 23 Wyo. 12, 146 P. 596 (1915); *Nicholson v. State*, 18 Wyo. 298, 106 P. 929 (1910); and *Cook v. Territory*, 3 Wyo. 110, 4 P. 887 (1884). See also *Evanson v. State*, Wyo., 546 P.2d 412 (1976); *State v. Gonzales*, 46 Wyo. 52, 23 P.2d 354 (1933); *Ivey v. State*, 24 Wyo. 1, 154 P. 589 (1916); and *Brantley v. State*, 9 Wyo. 102, 61 P. 139 (1900). In *Brantley v. State*, supra, 61 P. at 139–140, the relationship between the several degrees of homicide was described in this way:

" * * * [I]t is evident that in charging an intent to commit murder in the first degree there is necessarily included a charge of intent to commit murder in the second degree and voluntary manslaughter.

"Under our statute murder in the first degree, murder in the second degree and manslaughter each involves a felonious killing; to constitute the first it must be done with premeditated malice; the second is a killing with malice, but with the element of premeditation omitted, while in the case of voluntary manslaughter there is an intentional killing but without any element of malice or premeditation. It is therefore evident, we think, that the intent to commit murder in the second degree is specifically and sufficiently charged in the information and proof of such intent fitted the allegation. And so of intent to commit manslaughter. Proof can not be made of assault with intent to commit murder in the first degree which does not at the same time furnish appropriate and sufficient evidence to sustain a verdict for the lower, or included offenses of assault with intent to commit murder in the second degree and manslaughter."

Despite this impressive historical array, Deborah Jahnke contends that a proper analysis of our recent decisions in *Balsley v. State*, Wyo., 668 P.2d 1324 (1983); *Stamper v. State*, Wyo., 662 P.2d 82 (1983); and *State v. Selig*, Wyo., 635 P.2d 786 (1981), teaches that voluntary manslaughter cannot be a lesser-included offense when the charge is murder. She argues that the offense of voluntary manslaughter contains elements not found in the offense of first degree murder. The element which Deborah Jahnke contends is not included is that the killing must be "upon a sudden heat of passion" in order for voluntary manslaughter to be found. She compares the elements of the offense of voluntary manslaughter as given by the court with the elements of first degree murder and then applies the rules of the cases she relies upon to the end that there is a different and additional element.

In *State v. Selig*, supra, 635 P.2d at 790, we quoted the test for instructing on a lesser-included offense from *United States v. Chapman*, 615 F.2d 1294–1299 (10th Cir.

---

**2.** In *Richmond v. State*, Wyo., 554 P.2d 1217 (1976), this court held that where the charged offense is first degree felony murder the giving of instructions on voluntary manslaughter as a lesser-included offense would be improper.

1980), cert. denied 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980) as follows:

"This Court has held that a defendant is entitled to a lesser-included offense instruction when the following five elements are present: (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) there is some evidence that would justify conviction of the lesser offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser-included offense, and (5) there is mutuality, i.e., a charge may be demanded by either the United States or the defense. * * *"

Deborah Jahnke argues that in applying that test in her case three of the five factors are missing, but her particular focus is upon her argument that the second factor is not satisfied in this instance. She urges that the elements of the lesser offense are not identical to part of the elements of the greater offense because as voluntary manslaughter is defined the homicide must be "without malice" and "upon a sudden heat of passion," which elements are not present in the charged offense of murder in the first degree. Deborah Jahnke then points to the following language in *Balsley v. State*, supra, 668 P.2d at 1329:

"In summary, we hold that a crime described by statute may not be necessarily included within another statutory offense unless all of the elements within the claimed lesser offense are to be found in the greater, and unless the greater offense cannot be committed without also committing the putative lesser offense."

Rule 32(c), W.R.Cr.P., justifies the giving of lesser-included offense instructions at trial. It provides:

"*Conviction of lesser offense.*—The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense

necessarily included therein if the attempt is an offense."

This rule is identical to Rule 31(c), F.R. Cr.P., and federal cases which interpret the counterpart of our rule are highly persuasive. *Balsley v. State*, supra; *Richmond v. State*, Wyo., 554 P.2d 1217 (1976); and *Evanson v. State*, Wyo., 546 P.2d 412 (1976). The basic principles governing the giving of lesser-included offense instructions under the federal rule have been articulated by the Supreme Court of the United States in this way:

" * * * Rule 31(c) of the Federal Rules of Criminal Procedure provides in relevant part, that the 'defendant may be found guilty of an offense necessarily included in the offense charged.' Thus, '[i]n a case where some of the elements of the crime charged themselves constitute a lesser crime, the defendant, if the evidence justifie[s] it * * * [is] entitled to an instruction which would permit a finding of guilt of the lesser offense.' *Berra v. United States*, supra [351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013]. See *Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980. But a lesser-offense charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses. *Berra v. United States*, supra; *Sparf v. United States*, 156 U.S. 51, 63–64, 15 S.Ct. 273, 277–278, 39 L.Ed. 343. In other words, the lesser offense must be included within but not, on the facts of the case, be completely encompassed by the greater. A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense. *Berra v. United States*, supra; *Sparf v. United States*, supra, 156 U.S. at 63–64, 15 S.Ct. at 277–278. * * *" *Sansone v. United States*, 380 U.S. 343, 349–350, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

The fallacy in Deborah Jahnke's argument that it was error to instruct on the

lesser-included offense is the assumption that killing "upon a sudden heat of passion" is truly an element of the offense of voluntary manslaughter. The statute in effect at the time of the homicide in this case adopted the common-law definition of the crime of voluntary manslaughter by declaring in pertinent portion that "[w]hoever unlawfully kills any human being without malice, express or implied, * * * voluntarily, upon a sudden heat of passion * * * is guilty of manslaughter * * *." Section 6–4–107, W.S.1977; *State v. Lantzer*, supra. The common-law offense of manslaughter was distinguished from the common-law crime of murder by the absence of malice in the commission of the homicide. 4 W. Blackstone, Commentaries *190–201; 2 Wharton's Criminal Law § 151, p. 223 (14th ed. 1979). At common law all voluntary homicides were presumed to be malicious unless there was a showing of adequate provocation to mitigate to voluntary manslaughter what otherwise would be murder. 4 W. Blackstone, supra, at *201; 1 Hale, Pleas of the Crown 455 (1st Am. ed. 1847); and 2 Wharton's Criminal Law § 153, p. 237. Accordingly, voluntary manslaughter was deemed to be a lesser-included offense of murder at common law. 1 Hale, supra, at 449; 2 W. Hawkins, Pleas of the Crown 619–620 (8th ed. 1824); and 1 Bishop, Criminal Law § 795, p. 567 (9th ed. 1923). The relationship between murder and manslaughter was summarized by Lord Hale as follows:

"Murder and manslaughter differ not in kind or nature of the offense, only in the degree, the former being the killing of a man of malice prepense, the latter upon sudden provocation and falling out." 1 Hale, supra, at 449.

Following these precepts of the common law, the phrase "upon a sudden heat of passion" as used in § 6–4–107, W.S.1977, is descriptive of the provocation or lack of malice which makes a homicide manslaughter instead of murder. In *State v. Helton*, supra, 276 P.2d at 442, this court stated:

"Our laws recognize an intermediate crime lying someplace between the excusable, justifiable or privileged killing of a human being, and the unlawful taking of a life with malice. This is an unlawful type of voluntary homicide which is not legally excused, privileged or justified, but wherein there is an absence of express legal, implied, or constructive malice. So we find in our law, that the intentional (i.e. voluntary) doing of the wrongful act, 'upon a sudden heat of passion', although completely free of express, implied, constructive or legal malice, but committed without legal excuse, privilege or justification, is a punishable crime which we call voluntary manslaughter. This simply recognizes that there may be circumstances surrounding a killing which cannot be justified under the law of self-defense, and while not producing that degree of mental disturbance or aberration of the mind which is necessary in law to excuse the homicide, still leaves the mind devoid of that wicked, evil and unlawful purpose, or of that wilful disregard of the rights of others which is implied in the term 'malice'. Such circumstances mitigate or extenuate the act and make the homicide a crime of lesser degree. The 'sudden heat of passion' contemplated by our voluntary manslaughter statute is descriptive of just such a state of mind, and it may occur from any emotional excitement of such intensity that it temporarily obscures reason, or leaves the mind bereft of reason."

We conclude that the descriptive phrase in the statute is simply a way of saying that the element of malice required for murder in the second degree and also murder in the first degree is not required. Consequently it is not a true element of the offense of voluntary manslaughter, and we reaffirm prior decisions that voluntary manslaughter is a lesser-included offense with respect to charges of murder in the first degree and murder in the second degree under the statutes which were in effect at the time of this homicide.

Deborah Jahnke also invokes the third factor of the test in *United States v.*

*Chapman,* supra, as adopted by this court in *State v. Selig,* supra. She correctly asserts that there must be some evidence which would permit the jury rationally to find the accused guilty of the lesser offense and not guilty of the greater offense before a lesser-included offense instruction is appropriate. *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *Stamper v. State,* supra, 662 P.2d at 93; *Jones v. State,* Wyo., 580 P.2d 1150 (1978); *State v. Goettina,* 61 Wyo. 420, 158 P.2d 865 (1945); and *State v. Gonzales,* supra. We have uniformly held that "the trial court should only give such instructions as arise from the evidence and that when the evidence shows that the defendant is either guilty or not guilty of the higher grade of the offense, the court is not required to instruct on the lesser offense." *Oldham v. State,* Wyo., 534 P.2d 107, 109 (1975). See also *Stamper v. State,* supra, 662 P.2d at 92; *State v. Selig,* supra, 635 P.2d at 791; *Neilson v. State,* Wyo., 599 P.2d 1326 (1979), cert. denied 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980); and *Ross v. State,* 16 Wyo. 285, 93 P. 299, reh. denied 94 P. 217 (1908). In *State v. Selig,* supra, 635 P.2d at 791, the significance of the evidence in a determination with respect to the giving of a lesser-included offense instruction was said to be:

> "The third and fourth conditions prerequisite to the giving of lesser-included offense instructions necessitate consideration of the evidence in the given case. The evidence must be considered to determine whether or not there is evidence upon which a conviction for the lesser offense can be founded, and to determine whether or not there is sufficient dispute as to such evidence to justify a conviction on the lesser offense rather than the greater."

The determination of the credibility of witnesses and the weight to be given evidence are questions to be resolved by the jury, and it follows that if there is any evidence which would permit the jury rationally to acquit a defendant of the greater offense and convict of the lesser, upon proper request the trial court must instruct on the lesser offense. *United States v. Keeble,* supra, 412 U.S. at 208, 93 S.Ct. at 1995; *Stevenson v. United States,* supra, 162 U.S. at 314–315, 16 S.Ct. at 839–40; *Stamper v. State,* supra, 662 P.2d at 92–93; *State v. Selig,* supra, 635 P.2d at 791; and *Goodman v. State,* Wyo., 573 P.2d 400 (1977).

Deborah Jahnke contends in this regard that the evidence was not sufficient to support the giving of the lesser-included offense instructions on the charge of aiding and abetting voluntary manslaughter. In her view there was no evidence from which the jury rationally could conclude that her participation in the patricide was "upon a sudden heat of passion" which represents the intent or mental state required for the commission of voluntary manslaughter. Her argument in this regard is consistent with her contention that a "sudden heat of passion" is an element of the crime separate and apart from the requirement that the killing be done voluntarily but without malice. We have disposed of that contention. Nevertheless we must resolve Deborah Jahnke's claim that as an "accessory before the fact" it is incumbent upon the State to prove that her association and participation in the crime encompassed the state of mind required for the substantive offense of which she was convicted.

Wyoming has abrogated the common-law distinctions between principal, aider and abettor, and accessory before the fact to felonies. At common law, the parties to a felony were divided into four categories: (1) principals in the first degree—the actor, or actual perpetrator, of the offense; (2) principals in the second degree—those who are present, aiding and abetting the commission of the offense; (3) accessories before the fact—those who are not present at the commission of the crime, but who have counseled, procured or commanded another to commit it; and (4) accessories after the fact—those who, knowing a felony has been committed, receive, relieve, comfort, or assist the felon. 4 Blackstone, Commentaries *34–40; Annotation: Acquittal of Principal, or His Conviction of Lesser De-

gree of Offense, As Affecting Prosecution of Accessory, or Aider and Abettor, 9 A.L.R. 4th 972 (1981); 21 Am.Jur.2d Criminal Law, §§ 167–175, pp. 320–332; and 22 C.J.S. Criminal Law, § 81, p. 239. Our statute with respect to the first three categories provides that each "may be indicted, informed against, tried and convicted in the same manner as if he were a principal." Section 6–1–114, W.S.1977; *Hawkes v. State*, Wyo., 626 P.2d 1041 (1981); and *State v. Weekley*, 40 Wyo. 162, 275 P. 122, 64 A.L.R. 420 (1929). The result is that differences in the manner of participation by the parties to the commission of a felony do not affect their individual culpability for the crime. Each, whether he is the principal, an aider and abettor, or an accessory before the fact, is treated as a principal for purposes of punishment. Section 6–1–114, W.S.1977.[3]

The Information charged Deborah Jahnke with participation in murder in the first degree by alleging that she "did unlawfully and feloniously aid and abet Richard John Jahnke in the commission of first degree murder." The State's trial theory was consistent with this charge, that is, that the appellant actively participated and assisted her brother in what she later described as an "execution" of their father. Deborah Jahnke, on the other hand, by cross-examination and argument, proceeded on dual theories: (1) that it was impossible to convict her of aiding and abetting a felony because the underlying homicide was justified under the law of self-defense; and (2) that even if the homicide was not justified as an act of self-defense, Deborah Jahnke was blameless because she did not actively participate in or associate with her brother's criminal venture.

■ The classic statement of the requisite involvement to justify convicting an accused of aiding and abetting the commission of a criminal offense is that of Judge Learned Hand in *United States v. Peoni*, 100 F.2d 401, 402 (2nd Cir.1938), in which he stated that the accessory must "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." In a similar vein, we said in *Haight v. State*, Wyo., 654 P.2d 1232, 1238 (1982):

" * * * To convict one of aiding and abetting the commission of a substantive offense, the prosecution must prove that the substantive offense was committed by someone and that the person charged as an aider and abettor associated himself and participated in the accomplishment and success of the criminal venture. * * * "

The prosecution must demonstrate that a defendant shared the criminal intent of the principal if he is to be found guilty as an aider and abettor. *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *United States v. Peoni*, supra; *United States v. Winstead*, 708 F.2d 925 (4th Cir.1983); *United States v. Beck*, 615 F.2d 441 (7th Cir.1980); *Bosnick v. State*, 248 Ark. 846, 454 S.W.2d 311 (1970); *People v. Tewksbury*, 15 Cal.3d 953, 127 Cal. Rptr. 135, 544 P.2d 1335, appeal dismissed and cert. denied 429 U.S. 805, 97 S.Ct. 38, 50 L.Ed.2d 65 (1976); *Harper v. State*, 155 Ga.App. 764, 272 S.E.2d 736 (1980); *State v. McAllister*, La., 366 So.2d 1340 (1978); *State v. Grebe*, Mo., 461 S.W.2d 265 (1970); *State v. Lord*, 42 N.M. 638, 84 P.2d 80 (1938); *Commonwealth v. McFadden*, 448 Pa. 146, 292 A.2d 358 (1972); *Red v. State*, 39 Tex.Crim.R. 667, 47 S.W. 1003, 73 Am. St.Rep. 965 (1898); *State v. Boast*, 87 Wash.2d 447, 553 P.2d 1322 (1976); 21 Am. Jur.2d Criminal Law, § 171, p. 329; and 22 C.J.S. Criminal Law, § 87, p. 255. The law does not require, however, that the defendant possess the identical intent as the principal. *United States v. Beck*, supra, 615 F.2d at 448–449. In other jurisdictions

---

**3.** The fourth common-law classification, accessories after the fact, was treated as a separate offense under the statutes applicable at the time of the present offense. Section 6–4–115, W.S. 1977. The statutory scheme of treating accessories after the fact as committing a separate offense and all other parties as principals has carried over into the revised Wyoming Criminal Code of 1982. Section 6–5–202, W.S.1977 (June 1983 Replacement).

which have statutes similar to § 6-1-114, W.S.1977, the courts have held that one who aids and abets in a homicide can be charged with and convicted of a greater or a lesser degree of offense than the principal, depending upon the mental set established at trial. *Bosnick v. State*, supra, 454 S.W.2d at 314-315; *State v. McAllister*, supra, 366 So.2d at 1343; *State v. Lord*, supra, 84 P.2d at 92; and *Red v. State*, supra, 47 S.W. at 1004. See also LaFave and Scott, Criminal Law, § 64, p. 507 (1972). Individual culpability of the several parties to the crime is determined by the intent of each of them. In this case, for example, although Deborah Jahnke's brother earlier had been convicted of voluntary manslaughter, that would not have foreclosed a verdict that Deborah Jahnke aided and abetted first degree murder if the jury had found that she associated herself with and participated in the killing of her father acting purposely and with premeditated malice.

▮ The jury in this case rationally could find Deborah Jahnke guilty of voluntary manslaughter while acquitting her of the greater charged offense of murder. When he testified, Richard Jahnke characterized Deborah Jahnke as being very upset and crying after their parents had left and he had stated his intentions. He described her as looking like she was losing it, murmuring, shaking, and walking around the house nervously running her fingers through her hair as they prepared for their parents' return. Deborah Jahnke was very upset when her request to "kill Mom" was refused. Deborah Jahnke's statement and Richard Jahnke's testimony both established that she had been directly involved in a violent family confrontation that evening, and that both had been victims of prior abuse at the hands of their father. From this testimony the jury could have found that Deborah Jahnke was acting "upon a sudden heat of passion" aroused by the earlier incidents which continued through her participation in the planning and accomplishment of what she characterized as the father's execution. See *Helton v. State*, supra, 276 P.2d at 443; and *State v.*

*Flory*, supra, 40 Wyo. at 204-206, 276 P. 458.

▮ All that is required in order to support the giving of a lesser-included offense instruction is that there be some evidence which would permit the jury rationally to find the accused guilty of the lesser offense while acquitting of the greater. *Stamper v. State*, supra. The effort by the State to prove that Deborah Jahnke aided and abetted first degree murder does not preclude the giving of a lesser-included offense instruction if the proof offered by the State arguably failed to establish an element of the charged offense. This is the purpose for which the lesser-included offense doctrine originally was propounded. *Keeble v. United States*, supra, 412 U.S. at 208, 93 S.Ct. at 1995. The essence of the doctrine of lesser-included offenses is the universally recognized maxim of our jurisprudence that disputed questions of fact must be submitted to the jury for their resolution. See *Sparf v. United States*, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). Questions concerning intent or mental state are among those which uniquely are suitable for determination by the jury.

We also note that over the objection of the State the appellant insisted upon introducing the verdict in the prior trial of her brother into evidence. The jury would not have found Deborah Jahnke guilty of first degree murder once its members knew that her brother had been acquitted of that offense, and this explains her effort to have the jury's consideration limited to first degree murder. As we have said, this is not the law, and the evidence of her brother's conviction, coupled with other evidence of Deborah Jahnke's intent which was sufficiently in dispute, justified the giving of the lesser-included offense instructions by the district court. Under all the circumstances the submission of the instruction on the lesser-included offense in this case was proper, and no error can be found based upon that action by the district court.

Next Deborah Jahnke contends that the district court erred in denying her motion to suppress a statement given by her to sheriff's deputies on the morning following the killing of her father. The statement was admitted into evidence at trial over her objections. She argues that the statement was obtained in violation of her right to remain silent and her right to effective assistance of counsel guaranteed by the Fifth and Sixth Amendments to the United States Constitution.[4] In addition, Deborah Jahnke argues that the statement was obtained in contravention of the policy of the State of Wyoming promulgated in § 14–6–206(b), W.S.1977, which provides as follows:

"Any person taking a child into custody shall as soon as possible notify the child's parent, guardian or custodian. * * * *"

Essentially her argument is that a purported written waiver of her rights obtained prior to the initiation of questioning was ineffectual because as a juvenile she was incapable of voluntarily making a knowing and intelligent decision to relinquish those rights under the totality of the circumstances present at the time. She also urges that the failure to comply with § 14–6–206(b), W.S.1977, if it did exist, deprived her of an opportunity to consult with adults.

In several cases this court has considered the admissibility of custodial statements by minors. *Mayer v. State,* Wyo., 618 P.2d 127 (1980); *Mullin v. State,* Wyo., 505 P.2d 305 (1973), cert. denied 414 U.S. 940, 94 S.Ct. 245, 38 L.Ed.2d 166 (1973); *Jarrett v. State,* Wyo., 500 P.2d 1027 (1972); and *Mortimore v. State,* 24 Wyo. 452, 161 P. 766 (1916). We have stated the test of admissibility to be whether under the totality of the circumstances at the time the waiver of constitutional rights and subsequent statements were given voluntarily, knowingly and intelligently. *Mayer v. State,* supra. In these cases we have held

that the fact that the individual being questioned is a juvenile is simply a factor to be considered in the totality of the circumstances in order to determine whether the waiver was efficacious. This view is consistent with that espoused in *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197, reh. denied 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979), in which the Supreme Court of the United States said:

"This totality-of-the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. [Citation.]"

In other cases the Supreme Court has admonished that the greatest care must be exercised to assure that the giving of a statement by a juvenile was in fact voluntary and not the product of immaturity, ignorance or coercion. *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Gallegos v. State of Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, 87 A.L.R.2d 614 (1962), reh. denied 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed.2d 835 (1962); and *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), cert. denied 337 U.S. 945, 69 S.Ct. 1501, 93 L.Ed. 1748 (1949) (plurality opinion). Giving of the warnings required by *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L. R.3d 974 (1966), reh. denied *California v.*

---

4. In this appeal Deborah Jahnke does not rely upon the analogous provisions of our state constitution, Constitution of the State of Wyoming, Art. 1, Sections 10 and 11. See *Dryden v. State,* Wyo., 535 P.2d 483 (1975).

*Stewart*, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966), does not suffice in the instance of a juvenile to demonstrate a knowing and intelligent waiver of constitutional rights. The totality of the circumstances surrounding the custodial interrogation during which statements are obtained is to be examined to determine that in fact, and not merely in form, the accused knowingly and voluntarily waived the right to silence and to have the assistance of counsel. *Fare v. Michael C.,* supra, 442 U.S. at 724–725, 99 S.Ct. at 2571–72; *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); and *Miranda v. State of Arizona,* supra, 384 U.S. at 475–477, 86 S.Ct. at 1628–29.

■ The district court complied with the prior decisions of this court and held a full evidentiary hearing for the purpose of determining whether the appellant's statement should be suppressed. See *Hernandez v. State,* Wyo., 577 P.2d 643 (1978); *Raigosa v. State,* Wyo., 562 P.2d 1009 (1977); and *Dodge v. State,* Wyo., 562 P.2d 303 (1977). After considering all the evidence introduced at the suppression hearing, the district court ruled in a letter opinion which was incorporated by reference in its written Order that "based on all of the testimony, including that of the psychiatrist and psychologist who interviewed her sometime afterwards, that the State has carried its burden of proving beyond a preponderance of the evidence that the defendant did voluntarily, after advice of her constitutional rights, knowingly, intelligently, and voluntarily waive these rights, and therefore the Court finds and rules that the statements are admissible." Our review of the evidence introduced during the hearing on the motion to suppress, which is essential to the consideration of this claim of error by Deborah Jahnke, leads to the conclusion that the trial court did not err in refusing to suppress her statement and in allowing its introduction against her at trial.

At approximately 6:40 a.m. on the morning following the killing of Deborah Jahnke's father, a deputy sheriff approached her on foot in a park and, after identifying her, advised her that he was a deputy sheriff and that there were a couple of officers who wanted to talk with her. Deborah Jahnke agreed to accompany the deputy sheriff to his vehicle, and she waited in the car with him for the other officers to arrive. She said that she was sleepy, and her hair appeared as if she had been out in the wind. There was nothing else about her appearance that was unusual or remarkable. Deborah Jahnke asked whether her brother had been found, and she said she had read about the events of the previous evening in that morning's newspaper. She did not indicate at any time that she did not want to speak with the officers or that she wanted to leave.

Within minutes of the time that Deborah Jahnke was located, one of the officers who actually conducted the interview arrived at the park. He came to the vehicle where Deborah Jahnke sat and identified himself by displaying his credentials. He asked Deborah Jahnke if she would accompany him to the station house and talk with him, and she indicated she would not mind going to the sheriff's office and that she wanted to talk with the officers. Deborah Jahnke was then taken to the sheriff's office, arriving at approximately 7:00 a.m., and she was escorted into a patrol room where she was given a cup of coffee. While they were waiting for another officer to arrive, Deborah Jahnke told the sheriff's officer that she was scared.

The officer and Deborah Jahnke engaged in general conversation not related to the events of the prior evening while they waited approximately twenty minutes for a second officer to arrive. The conversation took place in the patrol lieutenant's office, a large room with windows on two of the walls. The appellant and the officer sat on opposite sides of a desk approximately six feet from each other. When the officer asked if Deborah Jahnke had an English accent, she told him that he was the one with the accent. At that time she appeared very calm and collected, was speaking in normal tones, and was being very respon-

sive to conversation. She did not indicate any desire to leave nor did she complain of being tired or hungry. She appeared to be intelligent and well versed in the English language, conversing in complete intelligible sentences. At that time Deborah Jahnke was seventeen years old and a senior in high school.

At approximately 7:24 a.m. the second officer arrived and he sat at the far end of the desk about eight feet from where Deborah Jahnke was seated. She was asked whether she could read and write the English language, and she gave an affirmative response. A written waiver of her constitutional rights form was given to her. The officer read each of the rights appearing on the form aloud while Deborah Jahnke read along on the form which had been provided for her. After these rights had been read to her, the officers asked that she indicate in the appropriate block on the form whether she understood the rights or not. She was told she could check the block any way that she desired. Deborah Jahnke checked the yes block, indicating that she understood her rights as outlined in the form. She then checked the appropriate block on the form and signed the form, thereby representing that she had the constitutional rights in mind and that she wanted to talk to the officers. The form was signed by both of the officers prior to any questioning. They explained to Deborah Jahnke that before any questioning took place they had to ensure that she did understand her rights.

Only then did the officers begin interviewing Deborah Jahnke about the events of the night before. During the initial portion of this interview one of the officers made notes of what Deborah Jahnke told them. The notes could not be produced at trial because after a complete and thorough search they could not be located. At the end of the initial stage of the interview the officers then asked Deborah Jahnke if she would consent to recording on tape the remainder of the interview, and she agreed to that. The officer testified that Deborah Jahnke appeared calm throughout the interview and was not threatened in any way

nor were any promises made to secure her cooperation. There was a break of approximately fifteen minutes while the necessary equipment to record the interview was set up. The record discloses that during this time Deborah Jahnke's mother came to the jail and asked to see her, but she was denied permission to see her daughter at that time. Deborah Jahnke again was advised of her rights and given the opportunity to reconsider her alternatives. The recorded portion of the interview began at 8:28 a.m. and lasted for nearly an hour and a half. The officer who had earlier taken notes testified that he referred to them periodically during the recorded interview to be sure that they had covered all the information included in the earlier unrecorded portion of the interview. At the conclusion of the recorded interview Deborah Jahnke was informed that she was under arrest and that charges would be filed against her. The record also discloses that at about 8:00 a.m. a teacher who was a friend of Deborah Jahnke had spoken with one of the officers and asked if she could see her, and permission was denied.

Prior to the advice that she was under arrest Deborah Jahnke had not been informed that she was a suspect in a crime or that her mother and a teacher had asked to speak with her. During the course of the interview she told the officers that she had slept the previous night in a clubhouse of a large apartment complex and had eaten the evening before. She stated that she felt fine and she did not appear nervous. The officer stated that he notified the sheriff's dispatch center when Deborah Jahnke was taken into custody earlier that morning, but he did not contact anyone further until after her statement had been concluded. Deborah Jahnke did not at any time during the interview request to speak to an attorney or ask to speak to any other adult. She did not ask to leave the interview. The officer testified that by the conclusion of the interview he believed that Deborah Jahnke was very intelligent and analytical in her answers to their questions. During the suppression hearing a transcript of the

tape-recorded interview was introduced into evidence.

A clinical psychologist and a forensic psychiatrist testified on behalf of Deborah Jahnke at the suppression hearing. The psychologist, who had interviewed Deborah Jahnke on two separate occasions for a total of approximately two hours while she was in custody in the county jail, said that he believed that she was emotionally instable as a result of the history of abuse in her home. He based that opinion upon the interview he conducted on November 18, 1982, immediately following the funeral of the father, and a second interview two days later. It was his opinion that Deborah Jahnke suffered from a mixed personality disorder and was not capable of knowingly and intelligently waiving her rights at the time that he spoke with her. This witness also testified that Deborah Jahnke appeared to be at least average in intelligence but immature. He conceded that he had conducted no diagnostic testing and was relying wholly upon impressions he had formed in the two brief interviews with Deborah Jahnke.

The forensic psychiatrist testified that in his opinion Deborah Jahnke was of average to above average intelligence but that she was very immature and suffered from emotional instability. It was his opinion that Deborah Jahnke was not capable of making an effective waiver of her rights at the time she was interviewed by the sheriff's officers. On cross-examination the witness conceded that Deborah Jahnke, although given to extensive fantasizing, was without a doubt capable of distinguishing fantasy from reality. He further testified that he was sure that Deborah Jahnke fully understood what the officers were saying when they advised her of her rights in accordance with the *Miranda* decision. He further testified that in his opinion at the time and place she gave her statement to the officers she understood the questions being asked of her and that she could request an attorney if she desired to. He said, however, that she was incapable of making that decision on her own due to many factors.

Our review of the record, including the particular evidence outlined above, persuades us that under the totality of the circumstances Deborah Jahnke made a voluntary, knowing and intelligent waiver of her rights prior to being questioned by the sheriff's officers. We agree with the trial judge that there was no reason demonstrated to suppress the statement. From her first contact with the deputy sheriff in the park throughout the interview with the other officers, Deborah Jahnke was willing to speak with them. She was given complete advice of her rights, and was capable of comprehending what was being asked her. At no time did Deborah Jahnke indicate any desire not to talk with the officers or to consult with any other person prior to or during the questioning. She responded readily and at length to all of the questions. Deborah Jahnke was of at least average intelligence and she understood her right to remain silent and her right to consult with the attorney. We can discover in this record no overreaching on the part of the officers or any manner of coercion in the obtaining of the waiver of Deborah Jahnke's rights to remain silent and to consult an attorney. The fact that Deborah Jahnke was a juvenile and was not given an opportunity to consult with an adult prior to waiving those rights does not make her waiver ineffective as a matter of law. See, e.g., *Fare v. Michael C.*, supra, 442 U.S. at 725, 99 S.Ct. at 2572; *United States v. Palmer*, 604 F.2d 64 (10th Cir. 1979); *State v. F.L.A.*, Alaska, 608 P.2d 12 (1980); *State v. Rodriguez*, 113 Ariz. 409, 555 P.2d 655 (1976); *People v. Terry*, 85 Cal.Rptr. 409, 2 Cal.3d 362, 466 P.2d 961, cert. dismissed 406 U.S. 912, 92 S.Ct. 1619, 32 L.Ed.2d 112 (1972); *State v. Turcio*, 178 Conn. 116, 422 A.2d 749 (1979), cert. denied 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 642 (1980); *Matter of D.A.S.*, D.C., 391 A.2d 255 (1978); *Arnold v. State*, Fla.App., 265 So.2d 64 (1972); *Lane v. State*, 247 Ga. 19, 273 S.E.2d 397 (1981); *Edwards v. State*, 227 Kan. 723, 608 P.2d 1006 (1980); *People v. Baxtrom*, 81 Ill.App.3d 653, 37 Ill.Dec. 437, 402 N.E.2d 327 (1980); *State v. Thomas*, 305 Minn. 513, 232 N.W.2d 766 (1975);

*Commonwealth v. Veltre,* 492 Pa. 237, 424 A.2d 486 (1980); *In re Williams,* 265 S.C. 295, 217 S.E.2d 719 (1975); *K.W.M. v. State,* Tex.Civ.App., 598 S.W.2d 660 (1980); *Green v. Commonwealth,* 223 Va. 706, 292 S.E.2d 605 (1982); *State v. Laws,* W.Va., 251 S.E.2d 769 (1978); and *State v. Jones,* 95 Wash.2d 616, 628 P.2d 472 (1981); contra, *People v. Maes,* 194 Colo. 235, 571 P.2d 305 (1977) (statutory); *Lewis v. State,* 259 Ind. 431, 288 N.E.2d 138 (1972); *Commonwealth v. Roane,* 459 Pa. 389, 329 A.2d 286 (1974); and *In re E.T.C.,* 141 Vt. 375, 449 A.2d 937 (1982) (state constitutional grounds).

■■■ Deborah Jahnke also argues some special application of § 14–6–206(b), W.S. 1977, which requires that notification be given as soon as possible to a child's parent, guardian or custodian when a juvenile is taken into custody. The implication of this argument is that the failure to furnish such notification would make Deborah Jahnke's statement inadmissible. It is clear from the record that the officer who arrested Deborah Jahnke at the conclusion of her interview did not personally notify her mother that she had been taken into custody. What the record does reflect, however, is that another officer of the Laramie County Sheriff's Department who was at the Jahnke home on the morning following the killing told Deborah Jahnke's mother that she had been found and was being taken to the sheriff's department office, and this advice occurred within minutes after Deborah Jahnke was initially approached in a park and identified. We have noted that permission was denied her mother to speak with her during the course of the interview, and that is a factor in the totality of the circumstances which we already have considered. Under these circumstances we can perceive no prejudice to Deborah Jahnke under these circumstances arising out of any asserted failure to comply with the notification statute. In fact, it would appear that timely notification was given to her mother by the officers of the law enforcement agency which took her into custody.

In her third claim of error Deborah Jahnke attacks the constitutionality of § 14–6–203, W.S.1977. Specifically the claimed error relates to § 14–6–203(c), W.S. 1977, which provides in pertinent part as follows:

"The jurisdiction of the juvenile court is not exclusive. If a minor is alleged to have violated a municipal ordinance, a complaint may be processed in the municipal court in the manner provided by general law or the complaint may be referred to the county and prosecuting attorney for disposition as provided in this subsection. *All complaints alleging misconduct of a minor other than violation of a municipal ordinance, of W.S. 12–6–101 or a misdemeanor violation of the Uniform Act Regulating Traffic on Highways, must be referred to the county and prosecuting attorney who shall determine the appropriate action to be taken and the appropriate court in which to prosecute the action.* * * *" (Emphasis added.)

Deborah Jahnke contends that this statute is unconstitutional on its face because it violates the separation-of-powers doctrine by placing a decision as to the appropriate court in which to prosecute within the discretion of an officer of the executive branch when that decision properly should be made by the judiciary; that due process requires that there be appropriate guidelines established with respect to the decision as to which court the case should be prosecuted in, and that the decision be made only after an opportunity for a hearing; and that the failure to establish guidelines for the exercise of the prosecutor's discretion results in a denial of equal protection. These arguments were not presented to the trial court. In fact, Deborah Jahnke's attorney stated in argument during a hearing on her pretrial motion to transfer proceedings to the juvenile court:

"Now, I have not raised any constitutional questions because I believe that under appropriate circumstances that kind of discretion may be appropriate, but it

would only be appropriate if there are some standards by which this court can review that discretion on the part of the district attorney."

 This court well might be justified in not considering this contention. Our rule is that in the absence of fundamental error affecting a substantial right of the appellant or involving the jurisdiction of the court, we do not consider questions sought to be raised for the first time on appeal. *Hopkinson v. State*, Wyo., 664 P.2d 43 (1983), cert. denied — U.S. —, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *Nickelson v. People*, Wyo., 607 P.2d 904 (1980); and *Nisonger v. State*, Wyo., 581 P.2d 1094 (1978). Furthermore, unless plain error is present, questions concerning the constitutionality of a statute are not considered on appeal if the party presenting them failed to present or argue the contentions in the trial court. *Hopkinson v. State*, supra, 664 P.2d at 50; *Jackson v. State*, Wyo., 624 P.2d 751, cert. denied 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981); and *Hampton v. State*, Wyo., 558 P.2d 504 (1977). There is no jurisdictional question present in this case. Our statutes vest concurrent jurisdiction in the juvenile court and district court for purposes of criminal prosecution of minors for felonies. Wyoming Constitution, Art. 5, § 10, and § 14-6-203(c), W.S.1977. Deborah Jahnke must rely upon plain error in order to present her argument on the merits to the court. See Rule 49(b), W.R.Cr.P.

In *Hampton v. State*, supra, 558 P.2d at 507, this court stated the criteria for applying the doctrine of plain error:

"While this Court has recognized that the plain error concept must be applied to each case on its own particular facts, and any attempt to define the term 'plain error or defects affecting substantial rights' is unlikely to be helpful (*Hays v. State*, Wyo., 522 P.2d 1004 (1974)), still there are some accepted criteria which we invoke when a claim of plain error is presented. When review is sought under the plain error doctrine the Court must be able to discern from the record, with-

out resort to speculation or equivocal inference, what occurred at trial, that is we are entitled to know the particular facts. [Citations.] Further, the proponent of plain error must demonstrate the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way. [Citations.] If these criteria are met, the error or defect must adversely affect some substantial right of the accused in order to avoid the application of the harmless error concept procedurally expressed in Rule 49(a), W.R. Cr.P. [Citations.] The assertion of a constitutional ground of error will not avoid the application of these criteria, and if they are not satisfied any claim for review under the plain error doctrine must fail. [Citations.]"

See also *Hopkinson v. State*, supra.

 We cannot discern in this case the existence of a clear and unequivocal rule of law. The discretion which is vested in the prosecutor by our statute to proceed against a juvenile in either the juvenile court or as an adult in the district court does not violate any constitutional requirements. There is no constitutional right to be tried as a juvenile. *United States v. Quinones*, 516 F.2d 1309 (1st Cir.1975), cert. denied 423 U.S. 852, 96 S.Ct. 97, 46 L.Ed.2d 76 (1975); *Cox v. United States*, 473 F.2d 334 (4th Cir.1973), cert. denied 414 U.S. 869, 94 S.Ct. 183, 38 L.Ed.2d 116 (1973); *Woodward v. Wainwright*, 556 F.2d 781 (5th Cir.1977), cert. denied 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978); *Russel v. Parratt*, 543 F.2d 1214 (8th Cir.1976); *United States v. Haynes*, 590 F.2d 309 (9th Cir.1979); *United States v. Bland*, 153 U.S.App.D.C. 254, 472 F.2d 1329 (1972), cert. denied 412 U.S. 909, 93 S.Ct. 2294, 36 L.Ed.2d 975 (1973); *Bailey v. State*, 269 Ark. 397, 601 S.W.2d 843 (1980); *People v. Thorpe*, Colo., 641 P.2d 935 (1982); *Johnson v. State*, Fla., 314 So.2d 573 (1975); *State v. Purdy*, 228 Kan. 264, 615 P.2d 131 (1980); *People v. Sprinkle*, 56 Ill.2d 257, 307 N.E.2d 161 (1974), cert. denied 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d

239 (1974); *State v. Doe,* 91 N.M. 506, 576 P.2d 1137 (1978); *Vega v. Bell,* 47 N.Y.2d 543, 419 N.Y.S.2d 454, 393 N.E.2d 450 (1979); *State v. Grayer,* 191 Neb. 523, 215 N.W.2d 859 (1974); *Jones v. State,* Okla. Crim.App., 654 P.2d 1080 (1982); *State, in the Interest of Atcheson,* Utah, 575 P.2d 181 (1978); and *State v. Hodges,* 28 Wash. App. 902, 626 P.2d 1025 (1981). Any decision to initiate criminal proceedings is vested in the prosecuting attorney, and the decision is discretionary. *Confiscation Cases,* 74 U.S. (7 Wall.) 454, 19 L.Ed. 196 (1869); *State v. Faltynowicz,* Wyo., 660 P.2d 368 (1983) (Thomas, J., concurring). Since one does not have an inherent right to be prosecuted as a juvenile but that is a privilege granted by the legislature, the legislature can restrict or qualify the privilege as it sees fit, so long as there is not involved any arbitrary or discriminatory classification. *Woodward v. Wainwright,* supra, 556 F.2d at 785. See, e.g., *Lamb v. Brown,* 456 F.2d 18 (10th Cir.1972).

■ The legislature of the State of Wyoming has chosen to vest in the prosecuting attorney the discretion with regard to what charges to file and in what court they should be filed. There may be circumstances which would justify judicial review of the prosecutorial discretion, but in the absence of such suspect factors as race, religion or other arbitrary classification, the exercise of discretion by the prosecutor in deciding whether to charge as a juvenile or adult involves no violation of due process or equal protection of the law. *United States v. Bland,* supra, 472 F.2d at 1337; *People v. Thorpe,* supra, 641 P.2d at 939. As the Court of Appeals for the District of Columbia said in *United States v. Bland,* supra, 472 F.2d at 1337:

> "We cannot accept the hitherto unaccepted argument that due process requires an adversary hearing before the prosecutor can exercise his age-old function of deciding what charge to bring against whom. Grave consequences have always flowed from this, but never has a hearing been required."

■ Lastly on this point, even if we could accept Deborah Jahnke's argument that she had some right to be charged initially as a minor in the juvenile court, we would have to conclude that she has not demonstrated any prejudice in this case. Although she was initially charged in the district court as an adult, a full evidentiary hearing was held on her motion to transfer her case to the juvenile court. The district court considered the matter in all its aspects and concluded that it was appropriate that the charge continue to be prosecuted in the district court. In doing so it applied the criteria suggested in *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Deborah Jahnke does not argue that the court erred in its ruling, and therefore no error can be found arising out of the prosecutor's initial decision in this regard. We hold that the statute which vests authority in the prosecuting attorney to decide in the first instance whether charges against a juvenile should be presented to the district court treating the person as an adult or in the juvenile court is constitutional as against the concepts urged by Deborah Jahnke, and the decision of the district court that the case appropriately was prosecuted in the district court is correct.

■ The final point of error urged by Deborah Jahnke is that the sentence imposed upon her of not less than three nor more than eight years in the Women's Penitentiary violates Art. 1, § 15, of the Wyoming Constitution. That constitutional provision provides as follows:

> "The penal code shall be framed on the humane principles of reformation and prevention."

At the sentencing hearing the district judge stated that he had reviewed the case extensively and had considered all of the relevant factors and the commonly used reasons for sentencing which he identified as rehabilitation, deterrence, punishment and removal from society for its protection. He then eliminated rehabilitation, at least in the usual context that that principle is applied. He noted that incarceration was

not required to protect society. He then stated that the concept of deterrence requires a sentence of incarceration in this particular case. Finally he noted that punishment was an appropriate justification for incarceration. Deborah Jahnke's position is that since the justifications relied upon by the district court for imposition of a sentence of incarceration are not included in Art. 1, § 15 of the Wyoming Constitution, the sentence imposed evidences a clear abuse of discretion and must be reversed.

Initially the State meets this argument by relying upon *Apodaca v. State*, Wyo., 571 P.2d 603 (1977), in which the court followed the traditional rule of not considering questions of a constitutional magnitude which were not presented to or raised in the trial court. Continuing in its brief to meet the claim on its merits, the State contends that the sentence does not manifest an abuse of discretion.

While the focus of the claim of abuse of discretion presented by Deborah Jahnke is somewhat different, still much of what we said in the case of her brother, Richard, *Jahnke v. State*, supra, is applicable. There we reaffirmed the rule that a sentence within the statutory limits will not be disturbed upon appeal absent a clear abuse of discretion and cited a number of cases supporting that proposition. In this case, as in the case of Richard Jahnke, the record discloses that the trial judge had considered very carefully the matter of an appropriate sentence, including a proposal by Deborah Jahnke through her counsel, the presentence report of the Department of Probation and Parole, and the pertinent factors to be considered in sentencing. The sentence which was imposed was within the statutory limits, and we can discern no abuse of the sentencing judge's discretion. The constitutional provision upon which Deborah Jahnke relies is not so narrowly drawn that we would be justified in concluding that the only factors which the court may consider in the imposition of sentence are prevention and rehabilitation. The provision speaks to the penal code, not to sentencing, and we are unable to detect any intent on the part of the Constitutional Convention to so limit the discretion of sentencing judges in criminal cases.

There is no error in the proceedings in the district court. The judgment and sentence of the district court are affirmed.

ROONEY, Chief Justice, concurring.

I concur with the majority opinion, but believe that a few things must be said with reference to that contained in the dissenting opinion.

### I.

In the dissenting opinion, and in much that has been said and written otherwise about this case, great concern is evidenced about the abuse and beatings administered by the appellant's father to her and to her brother all of which engendered a mental and emotional condition in them, which, in turn, resulted in a climax of hate, fear and desperation, which, again in turn, caused the homicide. The legal problem with using this as a ground for a finding of not guilty or for a reversal on appeal is that it was not put forth as a defense. If appellant or her brother had pled not guilty by reason of mental illness or deficiency, temporary or otherwise, the jury may well have acquitted them. Appellant and her brother did not do so, but opted to rely on self-defense. A court cannot properly find self-defense when the homicide is committed from ambush. All of the recital of past bad acts by the victim-father may evoke sympathy and compassion for appellant and it may evoke condemnation of the victim-father, but it was not represented to the court as having "snapped the mind" of the appellant or having resulted in temporary insanity. The plea was otherwise. The request to the jury for a finding of not guilty was founded on the theory of self-defense. The jury could not find self-defense on the part of one attacking from ambush.

### II.

The dissenting opinion refers to an objection to testimony of one of the interrogat-

ing officers concerning a statement made by appellant on the grounds that the statement itself was the best evidence and because it was hearsay, and the dissenting opinion contends that the objection was valid and it should have been sustained. The dissenting opinion would seem to imply that an oral admission or confession is not admissible evidence and that only that part of a confession or admission which is reduced to writing, or recorded, is admissible. The general rule is that:

" * * * [C]onfessions are competent evidence, possessing considerable probative value, and are not in and of themselves inadmissible. The securing of voluntary confessions from guilty persons is desirable and should be allowed in the interests of public welfare and safety. * * * " 23 C.J.S. Criminal Law § 817(1), p. 158 (1961).

" * * * [I]t [a confession] may be oral or written in whole or in part; and there is no requirement that an oral confession be reduced to writing or that the oral statement, after transcription by another, be signed by accused. * * * " 23 C.J.S. Criminal Law § 816(a), p. 154 (1961).

That confessions and admissions are not within the hearsay rule is recognized in Rule 801(d), W.R.E., which provides that:

"(d) * * * A statement is not hearsay if:
* * * * * *

"(2) * * * The statement is offered against a party and is (A) his own statement, * * *."

And in Rule 801(a), W.R.E., which provides:

"(a) * * * A 'statement' is (1) an *oral or written* assertion * * *." (Emphasis added.)[1]

The dissenting opinion would infer that the court refused to allow the tape of the interview of appellant into evidence. It was never offered. Appellant could have offered the tape if she believed it to be the best evidence of her confession. She did not do so. The testimony of the witness was not for the purpose of proving the content of a writing or recording. It was simply to recite a confession.

## III.

The majority opinion sufficiently refutes the other contentions in the minority opinion.

BROWN, J., specially concurring.

The Jahnke cases are reminiscent of the apocryphal accused who murdered his parents and then appealed to the court for mercy because he was an orphan. The news media latched on to these cases and carried a preposterous story of self-defense to the public with missionary zeal.

The court's opinions here and in *Jahnke v. State*, Wyo., 682 P.2d 991 (1984), describe the elaborate plans made for the execution of the senior Mr. Jahnke. I do not recall that the newspapers said much about those elaborate plans. They delineated only a few circumstances surrounding the killing, then like a "refiner's fire and Fuller's soap" purified and sanctified Richard and Deborah Jahnke, who emerged heroes, worthy of praise. We have witnessed a remarkable feat of image building. The Richard Jahnke and Deborah Jahnke perceived by the public are an invention of the news media, and bear little resemblance to the persons who executed and aided in executing their father. The news media should bear a heavy burden for what they have done.

Juries and courts in this state will not buy into any story of self-defense as justifiable homicide when it is so patently unbelievable. Richard Jahnke, according to a jury of twelve citizens, was culpable. Deborah Jahnke was no less culpable than Richard. She did not pull the trigger, but she participated in the planning and was a

---

1. Of course, there are a number of other reasons for excluding a confession or admission, such as being a product of illegal arrest, *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); not voluntary, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); not warned of right to counsel and to remain silent, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

backup if Richard failed in the execution. In one sense Deborah Jahnke was more culpable than Richard; she wanted to kill the mother also.

I therefore agree that this case should be affirmed. I differ slightly with the majority in its disposition of the lesser included offense issue. To be compatible with *Balsley v. State*, Wyo., 668 P.2d 1324 (1983), the majority had to determine that killing upon a sudden heat of passion "is not a true element of the offense of voluntary manslaughter." The voluntary manslaughter statute, § 6–2–105, W.S.1977 (June 1983 Replacement), formerly § 6–4–107, W.S. 1977, seems to provide that (killing) "upon a sudden heat or passion" is an element of the crime of voluntary manslaughter. The committee which drafted the Wyoming Pattern Jury Instructions thought "upon a sudden heat of passion" was an element of voluntary manslaughter and set it out as element No. 4 of WPJIC, 7.502. District court judges traditionally instruct the jury that (killing) "upon a sudden heat of passion" is an element of voluntary manslaughter. The majority's reasoning on this issue is logical, but I would prefer that the legislature determine the elements of a criminal offense rather than this court.

I agree that voluntary manslaughter is a lesser included offense in the crime of first degree murder; however, I would modify this court's holding in Balsley. In that case the majority said:

"In summary, we hold that a crime described by statute may not be necessarily included within another statutory offense unless all of the elements within the claimed lesser offense are to be found in the greater, and unless the greater offense cannot be committed without also committing the putative lesser offense." *Id.*, at 1329.

In my concurring opinion in Balsley I attempted to point out that the "inherent relationship" test was a better test to determine lesser included offenses. I am concerned that the inflexible rule of the Balsley case will continue to plague us. I fear that in other criminal matters tradi-

tional lesser included offenses will not pass the Balsley test. In the case before us I would simply modify what the court said in Balsley and adopt the inherent relationship test as an additional test to determine lesser included offenses. Under the inherent relationship test I would find that voluntary manslaughter was a lesser included offense in the crime of first-degree murder.

The Jahnke juries found evidence of guilt beyond a reasonable doubt. Thus, I hope the majority opinion and this concurrence sound a warning to those who would emulate the Jahnkes.

CARDINE, Justice, dissenting, with whom ROSE, Justice, joins.

Sixteen-year-old Richard Jahnke shot and killed his father in the driveway leading to the family home. His sister, Deborah Jahnke, then seventeen years of age, was in the living room at the time. Immediately after the shooting she and her brother fled the home, then separated. Deborah wandered aimlessly until she found a vacant building where she stayed the night. The next morning, at approximately 6:30 a.m., she was apprehended at Frontier Park in Cheyenne, Wyoming. She was taken to the sheriff's office where she was isolated and held incommunicado although her mother was in the outer room asking to see her and one of her teachers called repeatedly asking to see her. She was in custody for four hours and interrogated for about three of those hours by two officers who ultimately secured her tape-recorded statement. Upon completion of her statement, she was placed in jail and charged with aiding and abetting first-degree murder. The taking of her statement and the testimony relating to the statement were critical to the State's case and Deborah's conviction of aiding and abetting voluntary manslaughter.

It is surprising how often good, honest men, acting in utmost good faith, can look at the same facts and circumstances and see them so differently. Thus, some of my brothers on the court see Deborah as a mature, intelligent, knowledgeable, mental-

ly alert and sound, capable child who knowingly confessed to aiding and abetting manslaughter. I see Deborah as a frightened child who, after a lifetime of beatings, abuse, molestation, and humiliation, had been so affected mentally that at various times she was in a severe state of depression, frightened, contemplated suicide, was out of touch with reality, fantasized, and was frequently unable to rationally control her emotions.

The reasons for providing that special provision should be made for protecting the constitutional rights of children are illustrated so clearly by the facts of this case. Let us examine the record. Dr. MacDonald, testifying at the suppression hearing, found Deborah having, " * * * an almost unbelievable history of parental abuse, including sexual assaults upon her * * *." He testified at the hearing on the motion to suppress her statement that she was beaten by her father as far back as she could remember, somewhere around the age of four and that the beatings took place about twice a week until she was thirteen years of age. After the age of thirteen, she was beaten once a week. Her father would punch her, grab hold of her hair, throw her against the wall and shake her so that her head was bobbing back against the wall. She was beaten for failing to spell her name correctly on her lunch sack, for leaving crayons laying around, for making noise, for not cleaning her room, or for being disrespectful to her mother. She was beaten with a belt, shoes, with fists, hands, and a paddle. She would have welts and bruises and black marks on her arms and head. She has memories of her brother and mother being beaten, of her father kneeling on her mother's head and her mother pleading and sobbing and her father beating her with his fists and saying "I'll give you something to complain about."

Maria Jahnke testified that her husband was violent and became enraged over little things. She begged him not to beat the children because they were small, but he would go into a rage, grab her, shove her against the wall and the furniture and beat her. When Deborah was four years old, he beat her with a strap; but when the children were older, he beat them with his fists. Mrs. Jahnke testified that in Phoenix, Arizona, he pinned her down on the couch, and

> " * * * hit me on the sides of my face. He was like a madman. And I know Richard, he was small, and he came into the room and said, 'Please leave my mother alone.' And then he went after him.

> \* \* \* \* \* \*

> "And he let go of me and then he went after him in the living room, and at that time I could hear that he was punching him."

And, with respect to Deborah, Mrs. Jahnke testified, if she didn't brush her teeth correctly, he would explode and, "he would grab her by the hair and go into the bathroom and brush her teeth for her and scrub her face," until, as Deborah stated, they would bleed and she had trouble eating.

How had this kind of abuse affected her? What was her mental state when she was taken into custody at Frontier Park and during interrogation? Deborah talked frequently to one of her high school teachers who said to her:

> "There is something about you and what I think it is, there is a very big conflict between what you show on the outside and what you really feel on the inside."

The teacher testified that,

> "She told me that things were horrible at home, mostly in terms of her father.

> \* \* \* \* \* \*

> "I asked her if there was physical abuse and she said yes.

> \* \* \* \* \* \*

> "[S]he was so dramatic with her friends and loud. She had a laughter which is not a laughter at all; it's a not so loud scream, a hysteria. She would go into uncontrolled laughter and the students

would roll their eyes and say what is the deal here.

\* \* \* \* \* \*

"I told her that I thought she needed some counseling. She said everybody always wants me to have counseling. \* \* \* '[E]verybody thinks I am insane.' 'I don't think you're insane. I just think you need to find some way to tie up the loose ends together. You are really fragmented.' "

Then finally, between 1:00 and 2:00 o'clock November 16, 1982, the afternoon of the day Richard Jahnke shot and killed his father, this teacher said to Deborah, "I have got enough time. \* \* \* You have got to have counseling, *you're about to explode.* She did not resist. We walked in to see [the counselor]." (Emphasis added.)

When the deputy sheriff took Deborah into custody the next morning at approximately 6:30 a.m., she said she was sleepy. The deputy observed that she appeared tired and her hair was not combed.

At the sheriff's office, in the interrogation room at 7:00 o'clock that morning, Deborah told the deputy she was scared. He noted that she was speaking with an English accent, but she said he was the one with the accent. (She often fantasized she was from Ireland and spoke with an accent.) A witness testified:

"[S]he tells people that she was born in Ireland. She has been in Ireland but never got off the airplane, and she effects what I think she thinks is an Irish accent."

Then she was read her *"Miranda* rights" and signed a standard form waiver of those rights.

At the time the officers were concluding her interrogation that morning, there was a question about whether she might be suicidal. The deputy who conducted the interrogation testified:

"At approximately 10:30 that morning after she was placed under arrest, I did have a question by one of the jailers—I don't recall who—as to the effect that she might be suicidal. And as I indi-

cated, I did not know. They were trying to determine whether she should be placed under watch—place a watch on her while she was staying in the sheriff's office. I indicated it might not hurt to have somebody periodically watch her."

A psychologist from the Southeast Wyoming Mental Health Center was immediately called and interviewed Deborah at the jail. He found her emotionally unstable and recommended that she be continued under a twenty-four hour surveillance. He concluded that she would have been incapable of knowingly and intelligently waiving her rights because of her fantasies and romanticizing, because she was frightened, tired, without sleep, needed a tremendous amount of reassurance and her general instability would have prevented her from doing that.

Here, then, was a scared little girl, fragmented, out of touch with reality, frequently fantasizing, who in the interrogation room was speaking with an "English accent," and who appeared suicidal to the extent that a psychologist from the mental health center was called and interviewed her shortly after the interrogation ended. He was of the opinion that in her state she could not have knowingly, understandingly and intelligently waived her constitutional right to counsel and privilege against self-incrimination.

In *Dryden v. State,* Wyo., 535 P.2d 483, 491 (1975), we stated:

"The privilege against self-incrimination and the right to advice of counsel are firmly established in this state \* \* \* [and]

\* \* \* \* \* \*

"The question is not whether the examining officers have been 'unfair' to the accused; it is whether the State has proved that the statements were freely made by an *informed and knowledgeable accused* after full and proper warning as to his constitutional rights." (Emphasis added.)

To be admissible, a confession must be voluntary and that must be determined

upon the particular facts of each case. *Mullin v. State*, Wyo., 505 P.2d 305, cert. denied 414 U.S. 940, 94 S.Ct. 245, 38 L.Ed.2d 166 (1973); *Jarrett v. State*, Wyo., 500 P.2d 1027 (1972). Incommunicado custodial interrogation can result in an overpowering psychological disadvantage such that an accused will often succumb to the pressures and urgings of the interrogators. Thus, in the interrogation of a child without counsel present or an opportunity to consult with an adult, great care is required to assure that a statement made by the child is not a product of fantasy or fright. *Application of Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). We have said that whether a child's statement, the product of custodial interrogation, is voluntary depends upon the facts of the particular case and that factors to be considered are age, intoxication, physical injuries, *lack of parental contact*, or *mental trauma*, any one of which would be sufficient to render the statement involuntary. *Mayer v. State*, Wyo., 618 P.2d 127, 130 (1980). Without more, I believe that Deborah's statement was not by an "informed and knowledgeable accused"; and, therefore, it was inadmissible for this reason alone. But there is more. It was inadmissible also for a failure to comply with the requirements of law concerning juveniles.

The constitution of the state of Wyoming provides in Art. 1, § 11, that "[n]o person shall be compelled to testify against himself in any criminal case * * *," and in Art. 1, § 10, that "[i]n all criminal prosecutions the accused shall have the right to defend in person and by counsel * * *."

Legislative enactments in effect at the time[1] concerning children required that law enforcement authorities advise not only the child but also his parents, guardian, or custodian of his right to counsel and to remain silent.

Section 14-6-206(b), W.S.1977, relating to children, provides in part:

"(b) Any person taking a child into custody shall as soon as possible notify the child's parent, guardian or custodian."

Section 14-6-209, W.S.1977, provides that a child detained without a court order must be afforded a hearing within 72 hours and,

"(b) At the commencement of the hearing the judge shall advise the child *and his parents, guardian or custodian of:*

\* \* \* \* \* \*

"(ii) *The right to counsel* as provided in W.S. 14-6-222;

"(iii) The child's *right to remain silent* with respect to any allegations of a delinquent act;

\* \* \* \* \* \*

"(vii) All other rights afforded a criminal defendant." (Emphasis added.)

Section 14-6-222(a), W.S.1977, provides:

"(a) At their first appearance before the court the child *and his parents, guardian or custodian* shall be advised by the court of their right to be represented by counsel *at every stage of the proceedings* including appeal, and to employ counsel of their own choice." (Emphasis added.)

The clear intent of the legislature in adopting these statutes is to insure that rights guaranteed by the constitution to adults are also secure for children by requiring that the child *and his parents* be advised of those rights. Sections 14-6-209(b) and 14-6-222(a), W.S.1977, supra, require that *the court* inform both the *child and his parents, guardian or custodian* of the right to counsel and to remain silent but do not in specific terms impose a similar requirement upon law enforcement officials. Does that mean the child is fair game before he gets to court; that law enforcement officials are permitted to do what the courts are prohibited from doing, i.e., hold the child incommunicado, keep the parents at bay, not inform the parents of the right to counsel, to silence, to employ

---

1. The applicable statutes were extensively revised in 1984, but retained the requirement that the child and his parents, guardian or custodian be informed of the right to counsel and to remain silent, §§ 14-6-222 and 14-6-223, W.S. 1977.

counsel and to consult with the child? If the court must advise the child *and his parents* of the right to counsel and to remain silent, surely law enforcement officials must do the same. This was the holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L. R.3d 974 (1966), with respect to adults, the Court stating:

"Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 86 S.Ct. at 1624.

The Fifth Amendment privilege and the Sixth Amendment right to counsel provided in court are protected outside of court for adults by informing the adult of those rights. *Miranda v. Arizona*, supra. By analogy, it is clear that the same rights afforded children in court must be afforded out of court by requiring that the child and his parents, guardian or custodian be advised of these rights provided by the constitution.

This child then, more than any other, desperately needed the help and advice of an adult to which she was entitled by statute. Being deprived of that help and advice, her confession was inadmissible as evidence not only because it was unreliable, but also because there was no valid waiver of her right to counsel and to remain silent. This result, i.e., that her statement be suppressed for failure to comply with the requirements of §§ 14-6-206, 14-6-209, and 14-6-222, W.S.1977, supra, flows from a " * * * deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. People of the State of New York*, 360 U.S. 315, 79 S.Ct. 1202, 1205–1206, 3 L.Ed.2d 1265 (1959).

I would hold, therefore, that before a child is interrogated in circumstances such as here presented, both the child and his parents, guardian or custodian must be informed of the constitutional right to remain silent, to be represented by counsel, to employ and consult with counsel, and all other rights afforded a criminal defendant both by our constitution and statutes. This requirement will accomplish the clear intent of the legislature. Constitutional rights guaranteed to adults will also be secure for children and not lost because the child was deprived of the counsel of an adult.

Protecting the constitutional rights of children by affording the help and advice of an adult is not new. Thus, in the absence of a statute providing for consultation with an adult, a confession was held inadmissible where a seventeen-year-old defendant was subjected to a continuous stream of interrogation at a time when his mother was desperately trying to be in touch with him. It was said that, in the course of extracting the confession, the seventeen-year-old defendant was sealed off by means of deception and trickery from the most likely avenue by which assistance of counsel might reach him. *People v. Townsend*, 33 N.Y.2d 37, 347 N.Y.S.2d 187, 300 N.E.2d 722 (1973).

The importance of securing for a child under interrogation, the advice and consultation of a parent, guardian, custodian or lawyer was recognized by the National Advisory Committee on Criminal Justice, Standards and Goals (1976), in the adoption of Standard 5.8 which provides in part:

"When police are conducting a custodial investigation of an individual who is legally a juvenile, they should take care not to allow that juvenile to waive the right against self-incrimination without the advice of counsel." P. Hahn, The Juvenile Offender and the Law, p. 384 (2nd ed. 1978),

and by the Institute of Judicial Administration, American Bar Association, Juvenile Justice Standards, Standard 3.2 which provides in part:

"For some investigative procedures, greater constitutional safeguards are needed because of the vulnerability of juveniles. Juveniles should not be permitted to waive constitutional rights on their own." Police Handling of Juvenile Problems, p. 6 (Ballinger Publishing Co. 1980),

and Standard 5.3(C), which provides:

"C. Presence of attorney. The right to have an attorney present should be subject to knowing, intelligent waiver by the juvenile following consultation with counsel. If the police question any arrested juvenile concerning an alleged offense in the absence of an attorney for the juvenile, no information obtained thereby or as a result of the questioning should be admissible in any proceeding." Release, Control, and Detention of Accused Juvenile Offenders Between Arrest and Disposition, p. 67 (Ballinger Publishing Co. 1980).

The standards take account of the fact, as was noted in *Application of Gault*, supra, 87 S.Ct. 1428, that

" '[W]e cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour * * *.' " 87 S.Ct. at 1453 (quoting *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948)).

And later in that opinion, quoting from *In the Matter of Four Youths*, Nos. 28–776–J, 28–778–J, 28–783–J, 28–859–J, Juvenile Court of the District of Columbia, April 7, 1961, the Court noted that statements of children are generally untrustworthy:

" '[T]he Court's decision * * * rests upon the considered opinion—after nearly four busy years on the Juvenile Court bench during which the testimony of thousands of such juveniles has been heard—that the statements of adolescents under 18 years of age who are arrested and charged with violations of law are frequently untrustworthy and often distort the truth.' " 87 S.Ct. at 1458.

Our sister state of Colorado recently adopted a statute which provides that statements or admissions of a child are not admissible against that child unless a parent, guardian, or legal custodian of the child is present and advised of the child's right to remain silent, to be represented by counsel, to have counsel present, to have counsel appointed, unless the public defender or counsel is representing the child and present at the time. *People v. Maes*, 194 Colo. 235, 571 P.2d 305 (1977).

After the adoption of legislation providing that a statement of a child over the age of sixteen years is inadmissible unless a good-faith effort is made to notify the parent, guardian or custodian of the child of certain rights including the right to visit and confer with the child, it was held that notifying a parent that a child was in custody, without more, did not meet the good-faith requirements of the statute and the statement was suppressed. *State v. Walker*, Iowa, 352 N.W.2d 239 (1984).

The legislature in our state has wisely adopted legislation requiring that both the child and his parents, guardian or custodian be informed of the right to counsel, the right to remain silent, and other constitutional rights afforded criminal defendants.

In this case Deborah's mother was not advised before interrogation of her daughter's right to counsel or right to remain

silent. Thus, the interrogating deputy was asked:

"Q. Did you tell her parents or an attorney or some other person responsible for Miss Jahnke about [her being in custody]?

"A. No, sir.

"Q. Did you cause that to be done?

"A. No, sir, I did not.

"Q. To your knowledge, was it done by anyone?

"A. Not to my knowledge."

When her teacher called the sheriff's office at 8:00 a.m. that morning, she was told:

"'No, she is being held. She isn't allowed to have any visitors.'"

And when Maria Jahnke arrived at the sheriff's office at 8:30 a.m. she was not allowed to see her daughter. When she suggested that Deborah should have an attorney, she was told an attorney would be appointed for her.

Deborah's statement should have been suppressed at trial, but it was not. Then the error was compounded, for the manner in which it was used against her was so utterly unfair and devastating that Deborah did not receive a fair trial. When the prosecution refused to offer into evidence the transcript of her statement which the court had ruled was admissible, defense counsel stated:

"I don't know why they are afraid of the tape, Your Honor, but it is, in fact, the best evidence, and I would renew that objection that this witness' testimony is not the best evidence."

Where a writing is the best evidence of the matter sought to be established and the writing is available, evidence which is secondary or substitutionary should not be received. *Harned v. Credit Bureau of Gillette*, Wyo., 513 P.2d 650 (1973); *Truck Terminal, Inc. v. Nielsen*, 80 Wyo. 223, 339 P.2d 413 (1959). Especially is that so when production of the original writing is essential to any accurate determination of the issues involved. *Edwards v. State*, Wyo., 577 P.2d 1380 (1978). Nevertheless,

one of the interrogating officers began testifying to his opinions and conclusions about what Deborah had said in her statement. Defense counsel renewed his objection that the statement itself was the best evidence. The objection was overruled, the court granting counsel a continuing objection to all of the testimony of the witness. The objection was valid. It should have been sustained.

The interrogating officer first testified that he had interrogated Deborah Jahnke for an hour making notes of the interrogation before he began to take her recorded statement. Then he turned on a tape recorder and, from the notes taken, began to take her tape-recorded statement which lasted something over one and one-half hours. The notes made before the tape-recorded statement were shredded by the department and not available for the trial. The interrogating officer testified that everything Deborah Jahnke said was contained in the recorded statement. The trial court, in ruling on a defense motion, stated:

"I am at a loss to ascertain how the defendant could have in any way been prejudiced by the failure to be able to produce these [shredded] notes which were fragmentary, and all covered in any event by the taped interview * * *."

The recorded statement was reduced to writing and offered as an exhibit in the suppression hearing. Since the recorded statement itself was complete, there was no reason for the court to receive the officer's opinions and conclusions about what Deborah Jahnke had said. The statement was the best evidence and should have been all that was received in evidence.

The extreme prejudice in permitting the officer to paraphrase and interpret Deborah Jahnke's statement for the jury is demonstrated by comparing his testimony with excerpts from the statement:

Detective's testimony:

"Q. The weapons were supports. Did she state she was to be there in any particular capacity?

"A. Yes, sir, she did. She told me that her capacity that night was to be as a support, as a backup to Richard."

Excerpt from Deborah Jahnke's statement:

"Okay. My intentions were just very simply, um, I'm not a violent person, the only time I would ever strike anybody or do anything like that, actively, is if it is in either self defense, or to defend somebody else. My father, in the past, extensively, carried a firearm with him, almost wherever he went. Or like he would have something in the glove compartment of his car and that was my concern. Because, if my father, like I felt that he was going to chicken out, that it was a scare tactic etc., my father has a very very short temper, he's very irrational, he's very irate. And, I, I've seen him, you know, just get hysterical over just teeny, tiny little things, you know. And he would just get hysterical and beat up on people, you know, beat up on all three of us, my mother, and my brother and me, just over the teeniest things because he just had a bad day at work. I thought, oh my God, what if he's armed. What if he pulls it out on my brother, what if he shoots him. What if he goes after me? At that point, definitely, yes, I would have shot him. But only as a very last resort. If he just came at me and he didn't have any firearms or something like that, I would have just put the weapon down and just took off you know."

With respect to an escape route, the detective testified:

"A. Deborah told me that she recommended to her brother that he escape through the back door, as she put it, which was between the garage and the kitchen area. Her concern was that her brother may become trapped in the garage area, and that that would be the easiest route to travel, the easiest escape route, as she told me later."

Excerpt from Deborah's statement:

"[Detective]: Did you get the impression that, uh, anytime or maybe throughout the whole, whole thing before your parents got home, that the incident that would happen would take place in the garage area? Was that the impression that you had?

"D.A. Jahnke: It didn't occur to me.

"[Detective]: Did he ever mention that that's where it was going to be?

"D.A. Jahnke: No.

"[Detective]: Okay. Then if I understand what you told me correctly, then, he was going, one of his ideas was to escape through the garage area?

"D.A. Jahnke: Maybe, I don't know."

And with respect to knowing her brother's intentions, the detective testified:

"* * * yes, she knew what her brother's intentions were that evening."

Deborah testified:

"[Detective]: In regards to your brother, after your parents left to go eat, I believe you said that Richard stated something to the effect that, I have to do this.

\* \* \* \* \* \*

"D.A. Jahnke: Okay. I, I interpret it as, that, well he's going to do something. Uh, well, he's going to be active, he's actually going to do something. I didn't think that he would just, you know, blow my father away. But simply, that this was something, that he was, that was bothering him intensely. Like, I remember in conversations, you know, he just, bring back all these really bad memories and things that I'd blocked out, or just choose not to remember or for whatever reasons and my brother always felt really ly, really bad and guilty because my father used to beat up on me. And he used to get sexual with me too. And I couldn't defend myself and he was like, like this high, he was younger than me, he couldn't defend me, you know. And, it just got to the point that he just couldn't take it anymore."

"D.A. Jahnke: Okay, well I felt that he was playing a role, that he was playing a role and that maybe if he just went through these steps, he'd just get out all of his bad feelings and just forget about it. Me, I was not playing a role. I was

torn between, I did not want to be like this, and I just said, oh my God, I just wish that I wasn't here, you know, and I told him, you know, I'm really scared. And, you know, this is terrible, I just, this doesn't seem real. But also I just felt kind of indebted to my brother, because he has been, he's always been very kind to me, very protective of me. And, you know, at first saying yes and then opting out."

"Nothing seemed real to me. I occasionally get into a state of mind that well, you know, this is, that this isn't, you know, real, and, you know, like I'm living in a movie or something. I felt it was a role. That my brother was just going through these steps, you know. I just thought, well, uh, it's something that. It's like sometimes, children when they play. You know, like I remember when I was little, when I used to ...

"[Detective]: Okay, excuse me. Were you playing a role?

"D.A. Jahnke: No.

"[Detective]: Did you see it as that? Or were you, were you serious about what you were doing?

"D.A. Jahnke: I didn't know what I was doing."

And with respect to an agreement to kill, the detective testified as follows:

"She told me also that her brother didn't verbalize anything specifically but that there was a tacit agreement between the two of them. She agreed with that concept."

Miss Jahnke's actual words in giving her statement follow.

"D.A. Jahnke: Okay, you know, just very simply, when he just told me that he couldn't take it anymore, he said uh, I really don't want you here, so I'll take you someplace. I'll look for the keys. And I put on my shoes, you know, thinking, you know, I really didn't want to be here, you know. I didn't know what to expect. I just felt really guilty, you know, because I'm really close to my brother.

"[Detective]: About, guilty about leaving him there alone?

"D.A. Jahnke: Leaving him there alone.

\* \* \* \* \* \*

"[Detective]: At that time, let me ask you okay, at that time, when he said that *did you have any indication of what he had in mind or what he might do?*

"D.A. Jahnke: *No.*

"[Detective]: The reason I ask that Deborah, is because, I guess I don't understand why you would feel guilty, leaving him there to face whatever it was that you ...

\* \* \* \* \* \*

"D.A. Jahnke: I've, I don't know, I've always been protective of my brother, especially recently. Like, I remember, there were these kids and we were really little going to grammer school, and they used to tease my brother and they would beat him up, you know, and I'd be there flinging them off, because I was bigger than they were, you know.

"[Detective]: Sounds like my sister.

"D.A. Jahnke: That's great, that's great you know.

"[Detective]: The stories I could tell you about my sister.

"D.A. Jahnke: But, basically, that's how *I felt that if something was going to happen I should at least be there to explain what was going on, and my brother shouldn't be left all alone."* (Emphasis added.)

With respect to what happened being a execution, the detective testified:

"She at one time told me that it was her assessment of the entire situation for that evening, that what had happened that evening was an execution; that's how she described it."

The following is from Deborah's statement:

"[Detective]: Where you indicated that you interpreted, wait I guess I should restate this. That you felt that your brother interpreted that action as an execution and then you had some, some other statements \* \* \*.

"D.A. Jahnke: Okay. It's just a hypothesis, my brother did not just, did not say to me, well you know, this is an execution * * *."

With respect to Mrs. Jahnke, the following was said:

"[Detective]: * * * you had asked him in reference, what about mother?

"D.A. Jahnke: Yeah. And, and he said that, you know, that she was going to be okay, that he wasn't going to do anything. Because his hostility, you know, even though she was an awful pain * * *, *there is no way in the world that my brother or me would ever want to hurt her, ever.*"

With respect to Deborah fleeing after the shooting and hiding from police, the detective testified:

"I asked her why she did that. She said she did not want to be picked up. She did not want to be caught."

What Deborah told the detective in her statement was the following:

"[Detective]: Would you at this time tell me why it was that you did not want to be picked up?

"D.A. Jahnke: Okay, um, it was just very simply, if I was, okay now, the police they were there within five minutes. I didn't want to be there at that time to say my brother did it. Also I didn't want to say that my brother did it, I didn't do anything, I'm innocent whatever, because that would be betraying him. I felt very strongly about that. * * * *"

The statement is thirty pages in length. It may be subject to different interpretations. But, it is the province of the jury to consider and interpret the words of the statement and to resolve conflicts therein, to draw such inferences as it sees fit, to give it such weight as the jury thinks it entitled, and determine the ultimate guilt or innocence of the accused. *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Ditrich v. United States*, 243 F.2d 729 (10th Cir.1957). The jury is the finder of fact. That is their function. *Taylor v. State*, Wyo., 642 P.2d 1294 (1982); 23A C.J.S. Criminal Law § 1118. In this case it was grievous, prejudicial error to permit the detective to inform the jury of his opinions and conclusions of what Deborah had said in her statement. Only the jury had a lawful right to decide the meaning of, inferences to be drawn, and effect to be given Deborah Jahnke's statement.

Conclusions drawn from facts are inadmissible in cases in which the normal experience and qualifications of lay jurors enable them to draw proper conclusions from those facts, and only in those cases in which such experience does not enable laymen to draw correct conclusions may experts be called upon. *Grayson v. Williams*, 256 F.2d 61 (10th Cir.1958).

It is true that opinion testimony by an expert with specialized training and knowledge about a subject not ordinarily understood by lay persons may be admissible if the expert is qualified and his opinion would be helpful to the jury. *Krahn v. Pierce*, Wyo., 485 P.2d 1021 (1971). No one contended the detective was an expert in interpreting the meaning to be placed upon and the effect to be given the oral statement of another person. There was no attempt to establish a foundation for the testimony, nor any attempt to satisfy the requirements of Rule 703, W.R.E., for its admission. Neither was the testimony of the detective admissible as an opinion by a lay witness, for it is generally held that "the nonexpert witness may not give his opinions or conclusions, but must confine his testimony to a report of facts," 31 Am.Jur.2d Expert and Opinion Evidence § 14; and where an opinion of a nonexpert witness is received, it is because it was "found necessary to admit the opinions or conclusions of nonexpert witnesses where the facts could not otherwise be adequately presented or described to the jury." 31 Am.Jur.2d Expert and Opinion Evidence § 14.

Rule 701, W.R.E., provides:

"If the witness is not testifying as an expert, his testimony in the form of opin-

ions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

The testimony of the detective was not based upon his perception (what he saw), but upon what he heard, and a review of what Deborah actually said in response to his questions makes clear that it was not helpful to a clear understanding of her testimony.

In *Commonwealth v. O'Dell*, 392 Mass. 445, 466 N.E.2d 828 (1984), an indictment was dismissed because it resulted from the inaccurate and incomplete testimony of a detective who was asked by a juror:

"'What about the driver, was he supposed to be involved in this thing or not?' The detective answered, 'We believe he was. He was the driver of the getaway van or the car.'" 466 N.E.2d at 830.

In fact, the detective's report showed that the driver had denied knowledge of the robbery; and the court stated,

"[P]resentation of the defendant's edited statement tended to distort the meaning of that portion of the defendant's statement that was repeated * * *." 466 N.E.2d at 830,

and the court found that:

"It is possible, and perhaps likely, particularly in view of the responses of the detective and the assistant district attorney to one juror's questions, that the grand jurors, being untrained in the law and uninformed that the defendant had denied having knowledge of Preston's criminal intent, incorrectly interpreted the defendant's statement as a confession that he was a willing participant in the crime. Clearly, the defendant's full statement was not such a confession, however." 466 N.E.2d at 830.

The court held it necessary to dismiss the indictment because of the impropriety of the detective's testimony. What occurred in this case was far more serious and should result in a reversal of the judgment entered.

The testimony was patently inadmissible. A proper objection was made and overruled, and that was error. That error would not have been cured by later receiving the statement into evidence, for then the jury would be in a position of having to resolve conflicts in the detective's testimony (which was inadmissible) and the statement itself. In any event, the statement was not received in evidence. There was cross-examination, but that could not overcome the prejudice created by the officer's inadmissible testimony. Finally, appellant should not have been put in the position of having to overcome inadmissible evidence.

The overwhelming prejudice resulting from that error is apparent. Had the detective's testimony been excluded and the jury permitted to receive Deborah's statement as they should have after the court ruled it "admissible in evidence," they could, in considering and weighing and resolving conflicts in the evidence, have determined: that Deborah Jahnke did not plan with her brother to kill their father; that she did not act as a backup but was given a gun which she would have used only to defend herself; that Richard did not need her help and wanted her to leave and was going to take her away and looked for the car keys; that she stayed, not to help him, but because, "if something was going to happen I should at least be there to explain what was going on"; that she did not plan his escape route or load or place the guns or even know how to shoot them (with respect to the guns involved—rifles and shotguns—she said in her statement:

"And, I guess it's the one he gave to me, because, it seemed to be the smallest. It was also the most attractive one there, probably. And, I've never, I don't recall ever firing a rifle or a shotgun or a riot gun or anything like, related to that.");

that the matter of the dogs and cats and lights were Richard's ideas and, in any event, insufficient; and finally that she was merely present when the incident occurred and was not an active participant. We have held that mere presence at the

scene of a crime without more is insufficient to establish guilt of the crime of aiding and abetting. *Haight v. State,* Wyo., 654 P.2d 1232 (1982). Thus, it is said that:

"The mere fact that a person with knowledge that another intends to commit a crime acquiesces in the commission will not, provided he does nothing to procure or to bring about the commission of the crime, render him an accessary before the fact.

"The mere fact that the accused had knowledge of an intended crime on the part of another and concealed the same or failed to prevent it will not render accused an accessary before the fact. Mere approbation of a proposed crime to be committed by another will not render one an accessary before the fact." (Footnotes omitted.) 22 C.J.S. Criminal Law § 93.

And so the jury might have found Deborah Jahnke not guilty of any crime at all.

I hasten to add that even if Deborah Jahnke's statement had been put in evidence and the detective had not testified, the jury might still, under the rules adopted in the opinion of this court, have found Deborah guilty of the same crime. But if she is to be found guilty and sentenced to prison, it ought to be in a fair trial, upon proper, legally admissible evidence; and if she is to be convicted by words from her own mouth, they ought to be her words, not those of someone else.

Finally, I would hold that, in any event, there is not, as a matter of law, evidence that will support this conviction of aiding and abetting voluntary manslaughter and that reversal is required.

"Since manslaughter was a killing without premeditation, at common law, there could be no accessary before the fact to manslaughter, and this remains the law today in some jurisdictions." (Footnotes omitted.) 40 Am.Jur.2d Homicide § 30.

The reason for the common-law rule is apparent for there is some difficulty in accepting the proposition that one can aid and abet a crime that occurs suddenly and in a heat of passion. And, even more difficult is the proposition that one not present at the scene of the killing could aid and abet the killing by acting hours beforehand suddenly and in a heat of passion. Section 6-1-114, W.S.1977 [2] makes aiding and abetting the commission of a felony a crime. Under similar statutes there is considerable authority holding that in some types of cases there can be an aiding and abetting of voluntary manslaughter. 40 Am.Jur.2d Homicide § 30. There may be cases in which that occurs. The problem is that this is not one of those cases.

Here, the court states in its opinion: "The jury in this case could rationally find Deborah Jahnke guilty of voluntary manslaughter * * *." I am at a loss to understand how that can be so. The court correctly affirms that "it is incumbent upon the State to prove that her association and participation in the crime encompassed the state of mind required for the substantive offense of which she was convicted." The "substantive offense of which she was convicted" is aiding and abetting voluntary manslaughter, and the state of mind required is that she acted "upon a sudden heat of passion," § 6-4-107, W.S.1977.

An aider and abettor

" * * * must do some act at the time of the commission of the crime that is in furtherance of the offense." 21 Am. Jur.2d Criminal Law § 168.

The acts charged to Deborah are that she put a cat in the basement, suggested that the outside lights be turned off, and acted as a backup to accomplish the killing in the event Richard failed. If we assume arguendo that she committed the acts charged, there is no evidence that she put a cat in the basement or suggested lights be out, or acted as a backup as she sat on a

---

**2.** Section 6-1-114, W.S.1977, in effect at the time of commission of this offense, provided: "Every person who shall aid or abet in the commission of any felony, or who shall coun-sel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed an accessary before the fact * * *."

sofa "suddenly" and in a "heat of passion." This court states that the fact that there had been a family fight earlier in the evening, that Deborah was upset and crying, and that she had been a victim of abuse was sufficient for the jury to find that in committing the acts charged, she acted "suddenly" and in "a heat of passion." Cases cited for this proposition are *State v. Helton*, 73 Wyo. 92, 276 P.2d 434 (1954), and *State v. Flory*, 40 Wyo. 184, 276 P. 458 (1929). In each of these cases the "sudden heat of passion" was claimed to have occurred at the time of the killing by the defendant who, seized at the moment by a heat of passion, fired the gun. Here the "sudden heat of passion" is said to have occurred sometime before the killing by one with time for cooling off and presenting no indication of acting "suddenly" or "heatedly" or "passionately." It is, thus, generally held that:

> "The absence of malice and the influence of sudden passion are the general characteristics of this offense, both at common law and under statutory definitions. Most courts agree that there must be sufficient cause of provocation and a state of rage or passion, without time to cool, placing the accused beyond the control of his reason, and suddenly impelling him to the deed. If any of these are wanting—that is, if there is provocation without passion, or passion without a sufficient cause of provocation, or there is time to cool and reason has resumed its sway—the killing will, as a rule, be murder." (Footnotes omitted.) 40 Am. Jur.2d Homicide § 56.

The State having failed to carry the burden of producing any substantial evidence to establish that Deborah acted suddenly and in a heat of passion, her conviction of the crime of aiding and abetting voluntary manslaughter should not be allowed to stand.

For all the reasons stated, I would reverse the judgment of conviction in this case.

